We have two cases this afternoon. Number 19-2809, Hargrove, et al., v. Sleepys, LLC, et al., Mr. Licken and Mr. Hank. Thank you, Your Honor. Should I proceed? Yes, you sure can. Yes, and I'd like to reserve two minutes. Not a problem at all. Okay. Even though on remand from the Third Circuit in New Jersey Supreme Court, the district court found that the three named plaintiffs in this case were employees of Sleepys, not independent contractors under the established ABC test, the district court clearly erred in finding that the class of Sleepys drivers who were misclassified as independent contractors could not be certified because the class was not ascertainable. The lower court's decision was clearly at odds with this court's repeated holding that at the class certification stage, the plaintiffs need only show that the class can be defined based upon objective criteria and that there is a feasible administrative mechanism for determining whether the putative class numbers fall within the class. As this court held in Byrd, these are the only two requirements for finding ascertainability, and it's not whether the plaintiffs proved what the actual class was, that is, the number of people in it and their names, but just that it was capable of so doing, which it clearly is in this case. The class in this case was clearly ascertainable using thousands of documents which were in the company's possession, many of which we obtained when discovery was ongoing back in 2008 and 2009. Let me ask you, when you decided to go down from 193 to 111, the difference in those 82 was what? What did those 82 have that the 111 had that the 82 additional people did not have? Sure. So the district court in the first hearing was concerned about the fact that there were contractors who, while they may have driven themselves, also had other routes for which they had other people, friends or relatives or contractors, not contractors, workers drive. He found that that was so the difference in the two classes was the 193 were all of the contractors except those that had a large number of routes, like 10 or 15, but who drove. And the smaller class were those that had driven only one truck or had only one truck either for the whole time they were there or for a substantial period of time that they were there. And we could ascertain that using documents provided by sleepies, at least for part of the time. We didn't have all hundreds of thousands of documents that one would need to put that together, but we had to represent the sample from which we could do that. So 73 that were full-time single driver and then 38 that were full-time single driver for one up to six months or something like that. Exactly. And then another 19 that were full-time single drivers for at least three months. Now, when the district court granted the summary judgment on employment status to plaintiffs, some of the plaintiffs operated several routes but drove full-time one of the routes. So it's not clear why the court would have made that distinction, and other courts have not made that distinction. But in any event, seeking to move for class certification a second time, we narrowed the class in accordance with what we thought were the court's instructions. You narrowed the class on a motion for reconsideration, correct? Well, we don't believe it was a motion for reconsideration. I don't want to spend a lot of time on this, but the court denied the motion for class certification without prejudice. It's very common in class certification to deny the first request without prejudice, saying that you need to do certain work or trimming. So we moved again the second time. We don't believe, and we cite a case law in our brief to the effect that that's not really a motion for reconsideration. It's just a subsequent motion for class certification. The court, and this is one of the errors we assigned to the court, treated it as a motion for reconsideration, which is a much stricter standard. But I'll rely on what we put in our brief for that, because I think the case law is pretty clear on that. So you're saying it was a renewed motion for class certification? Yes, correct, as occurs in many cases. It does appear that the courts are all over the ballpark on this. When you look at district courts across America, it's about evenly split. And your argument would be what, Rule 23? Yes, Rule 23. Exactly, that Rule 23 allows the filing or refiling of a Rule 23 class at any time. The court can amend an order or change the order or decertify a class, and that lends itself to the idea that it's not a motion for reconsideration, but it's just a renewed motion. And there are many courts, again, we cited in our brief that stand for that proposition. I would like to take some time, because I think it's critical, to understand why we are so convinced that the class was easily ascertainable by the district court judge. It does take a little reviewing of a number of documents, but they're all there, and they're all, I think, putting together persuasive on the issue that it's easier to identify who the class was. First of all, the objectively identifiable requirement was met because we agree that the class should be made up of people who drove full-time for sleepies. We think it's whether they had one truck, which is many people, about 100, or more than one truck. If they drove full-time, they meet the definition of the ABC test under the New Jersey Supreme Court's decision of sleepies. So that's the first part. The second part was whether this group was ascertainable, and that's where there was a lot of controversy back and forth between our position and the district court judge. But if you look at certain documents, it's clear beyond doubt that this is ascertainable. The first document I would point you to are the driver rosters, which are Joint Appendix 1120 to 1123, and that lists by initials the truck number, the owner of the truck, the name of the authorized driver for that truck, and the authorized helper. There's deposition testimony from two company witnesses, Zsas and Cindy Anderson, to the effect that from this document you could only drive, you could only go out that terminal gate if you were on an authorized list. And they had a list of every truck and every contractor and who the authorized driver for that truck was. And if you look at 1120 to 1123, there are a number of categories, and it lists, as you'll see, the initials for the name of the company. It lists who the owner is, that's at the top second column, who the authorized driver was and who the helper was. So by having that, we know who was authorized to drive the truck. And if you look at those documents, you'll see that just on that one date alone, when there was a driver roster, you'll see that there were mostly individuals who were both the owner and the only authorized driver for that truck. There are at least 46 of those on JA 1120 to 1123. So we know who the drivers were. What time period does that cover? So that's from back when we got Discovery, and that's only from 2009. What's the class period? The class period would go from 2010 to 2005, arguably to the present or whenever Sleepy's no longer was Sleepy's, which I think was a couple of years ago. You want us to say that the district court erred in failing to certify a class for a 15-year period from 2005 to 2020 and you only presented documents from 08 to 09? Well, I think that's a little unfair, Your Honor, because at the time that we conducted Discovery, the case was filed in 2010. We were sent, my colleague who was doing the case, Mr. Marchetti, was sent to a warehouse. He picked out thousands and thousands of documents. We have a lot of these logs, but only from that period. And then, as you know, the case went off on a tangent. It was dismissed on summary judgment. There were appeals first to the Third Circuit, who then certified it to the New Jersey Supreme Court. Are you saying you weren't allowed to discover the documents that were needed to have the full class period covered? No, I'm saying that we did not have to do that, because under the Third Circuit doctrine, we only have to show that there were documents from which the class could be ascertained, and we provided samples of that, not that they were obtained or were ascertained at the time. And the two company witnesses, Anderson and Zizas, testified that these rosters always existed, and you couldn't drive the truck. They wouldn't let you out of the truck with their mattresses unless you were the authorized driver on that. Do you have any cases to support the proposition that a two-year period is a sufficient sample for a 15-year or a 10-year or more class? Well, again, the class starts back in 2005. This is right in the middle of a class period. These documents were obtained from 2008 or 2009. Do you have any cases to support the proposition that a two-year sampling of documents is sufficient to certify a class for a 10-year or 15-year period? I believe that the jurisprudence from this Court is that you have to show. What cases? I'm just asking for the case names. Well, Arons and BMW and Carrera. I believe all of those stand for the proposition that you don't have to show who was in the class. You have to show that there are documents from which it is capable of being ascertained, and I think clearly what we've done shows that. If you don't have to show who's in the class, why did you reduce the class number from 191 to 111? 191 to 111. We reduced it because we were making a renewed attempt for class certification, and we believed as a strategic matter that based upon what the Court said in its first decision about that the logic of our class certification argument worked better for single root drivers, we reduced it to that. We didn't agree with that, but we did that as a renewed motion. If I may, there are many other documents that go further than 2008 that also stand for this proposition. We obtained thousands of what are called gate logs. So to confirm that the authorized driver was the driver and was the contractor, before you could get out of the gate each day, you had to go through a security guard, and that security guard wrote down the truck, the contractor, and the name of the driver. Did the gate logs tell us how long the driver worked? Not really. That data, because it just – I know we have documents that tell us how long the driver worked. Yes. Yes, there are, Your Honor, and I'll get to that. So the gate logs are just good to confirm the driver rosters, which I've already gone over, that if you wanted to confirm that the authorized driver was the appropriate driver for that particular day, you can look at the gate logs. But then there's the computerized data, which the company had, the so-called Agitech data. That's a computer software program that they used. And the Agitech data actually – and that's a joint appendix 985. That's a list which has on it the name of the company, which truck it was, and it has how many stops were on the particular day and how long it was estimated that that run would take. So if you look at that, it has the in time, the time that the truck should have started, the time that it should have ended, and it has the number of hours. They call that run length. You can see I'm looking at – That data comes about a three-week period, right? No, it's by day. By day, from when to when? The data we have now is, again, back from, I think, 2009. But the company witnesses testified that the Agitech – the software that they had to make sure that they were scheduling their runs and knowing who did the runs is a computer program that's always been in existence. And, again, it has the number of hours or the number of estimated hours for each day. It says run length. I have that up on my computer. You said J985, right? Yes. Okay. So tell us the name of the driver and the date it worked and how many hours that driver worked on that given date. Okay. So if you look at the last column – I'm sorry, the next to the last column, it has the run length. Before that, it has the first stop and last stop. Let's start with the driver name first. I just want to get the name of the driver, the date, and the number of hours worked by that driver on that date. Sure. So if you look at the second entry, it has SAC. Now, that's the initials for – I think his name was Andreas Savalos, Andy Savalos. That are his initials. We know that from the other records that those initials were the name of his company, and that's on both the gate logs and the other document I went over, the driver roster. We then know which truck it was because it has two after that. So that means that was his second truck, and we know who the authorized driver of that is from the driver log. You then have entries of the date. Wait, I'm sorry. Just slow down a little bit. So what was the driver's name again? I believe it's Savalos. Okay. We're looking at line item number two. Is that right? Yes. Okay. So I just see – I see a code there. How do we know that Savalos was actually the person that was driving the truck that day? Because if you go back to the driver roster, it has the code and it has who the authorized driver was for that truck. Are you saying that the authorized driver was necessarily the person who was actually behind the wheel of the truck? Yes, and I'm saying that you can confirm that, not because the two witnesses for the company testified that you could only drive the truck if you were the authorized driver on the driver roster. And you can confirm that, as we did, by then taking – it is tedious, but it can be done, and we did do it for two people, Clark and the other plaintiff in the Hargrove. We actually did that. You go back to the gate logs, and you can actually confirm by looking at the gate logs that during that period of time they were the listed driver on the truck. So you can actually confirm. Okay, so let's stick with Savalos for a minute. So Savalos worked on what day and how many hours did he work that day? Okay, again, going back to that, if you go to the run length, which is the next to the last column, it has a series of entries. It says the first one is, I think, 10 point something, 9 point something, 11 point something, 5, 10, 9, 8, 7, 10. Those are the company records of what they estimated he would have driven on that day, based upon the number of tasks that they gave him to do, the number of deliveries. And to the right of that are the deliveries themselves. He had 10 deliveries, 11 deliveries, 12 deliveries, 14 deliveries. Okay, so let's just stick with the one line item for a minute. So on September 25, 2009, you're saying this shows that Savalos had an estimated run length of almost 11 hours, 10.9 hours, with 19 spots, correct? Yes. Okay, so how do we know that that week he worked more than 40 hours? That looks like he had a long day on that day. That's more than an 8-hour day. But how do we know that week he worked overtime? Well, they have this for each day. And in addition to that, there is another document that we describe in our brief, which is the manifest. Each driver was given a manifest, and although this was not produced in discovery, one of our clients, Henderson Clark, had the manifest. Now that's at Joint Appendix 871. And that also has the times of the deliveries for each day. If you go to Joint Appendix 781, it shows exactly when the first delivery was supposed to be, what he was delivering, how many pieces of furniture. Is that Savalos also? No, the only – Can we just pick – I'm sorry, you're just going so fast for me. I'm trying to establish how many weeks Savalos – if you could just show me, hey, look, this week in September 2009, Savalos worked 42 hours, and that really helps show that he worked overtime that week. I just looked up September 25, 2009 was a Friday. So he worked almost 11 hours according to this document on that date. But how do I know how much he worked on the 24th and 23rd and the other days of that week? Where do I find that? They have a document. They have these Agitech documents for every day. I don't want them. I want you to show me – this is a voluminous record. Show me in this voluminous record with thousands of pages, show me where Savalos worked 40-plus hours in any given week. Or anybody else. If you can't do it for Savalos, show it for Hargrove or anybody else. As I understand it, your claim is you've got drivers that work more than 40 hours a week and you had drivers who had money deducted from their pay illegally. Isn't that the gravamen of your claim? Yes, the primary claim. Then show us which drivers had money deducted from their accounts illegally and or show us which drivers worked over 40 hours a week. I'm happy to do that. Again, although I don't have the manifest for Mr. Savalos because it has not been produced, I do have a computerized manifest. If you look at JA871, it tells you in exquisite detail exactly what Mr. Clark, Henderson Clark, another plaintiff in this case, did on the day in question, which is in 2009. It tells you where he stopped. It tells you what the times were. It tells you what the money was. Then if you want to look at where the deductions are, you go to a series of documents called the Outside Carrier Expense Detail Report. That is Joint Appendix 1226. If you look at Joint Appendix 1226, it has, for example, middle of the page down. It has the runs that he did that day. It has what he was paid. And then it has a deduction for, this says left plastic skag, I don't know what that means, minus $25. We had our data analyst look at that, and there are millions of dollars of these deductions from the expense detail reports. Now, these Outside Carrier Expense Detail Reports, we have all of them from 2009 to 2016, and not every day was there a deduction, but many days there were deductions, and we point them out in our brief. So I grant you that it may be that we have not ascertained the specific parameters of the entire class for the entire period of time. I beg to say that that's not the requirement in the Third Circuit with respect to ascertainability. It's whether these can be ascertained, and they have exquisitely detailed documents, which if you spend the time, which we did for two of the plaintiffs, and we said that in our brief, and we showed that they drove practically every day for a six-month period of time. We have the deductions that they suffered.  This is ascertainable. This is much more ascertainable, for example, than were the plaintiffs in errands, which were much more difficult to ascertain. And I would add that we have submitted affidavits from 13 individuals, drivers, single-group drivers who testified, who said in their affidavits that they drove well more than 40 hours a week and that they suffered deductions and that they were single-group contractors. And we have the deposition testimony of the two managers, Jesus and Anderson, who describe in detail how you can look at these records that I just described, perhaps not as well as they should have, and from that you can get this data and tell who drove when, what they made, and how many hours it's estimated that they drove. The final thing, if I may move on, the final thing I wanted to say, and I think it's important, is the second error that the judge made was in somehow determining that ascertainability was a problem because these individuals incorporated, and therefore whether there's a legal fiction that he couldn't tell whether the companies that they worked for, their own companies that they formed, took the deduction out of their pay. And that's just based upon a clear error of law. If these individuals are employees under the ABC test, and we already know that the three plaintiffs are because they were even found to be employees, then the money that sleepies paid them, whether it was through their corporation or directly, were their wages. And if they took money, deducted money, out of those, that compensation, that's an unlawful deduction under New Jersey law because wages is compensation for services performed, and that's what these individuals did. So with that, I'm sure I've extended my time, but thank you very much. Unless there are any further questions, guys? No, thank you. Okay. All right, let's hear from Mr. Haag, please. Thank you. This is Pat Haag on behalf of Sleepies. I will begin by pointing out that Mr. Lipton's presentation is most noteworthy, in my judgment, for its omissions. Number one, what the court didn't hear at any point in Mr. Lipton's presentation is a discussion of discretion. The district judge had discretion, number one, on whether to treat the successive motion for class certification as a motion for reconsideration. That point is supported by our citation to Newberg, which notes that most district judges do choose to treat successive motions as motions for reconsideration under the law. The one circuit court case that I have on that is Judge Newman's decision in Ray's initial public offering, Security Litigation 483 of 3rd 70. And it indicates that what you should do is look at this as a Rule 23 matter and don't engraft the three types of things that you otherwise would need for a motion for reconsideration in the typical context, which would be intervening, change, controlling law, new evidence, or that there was a need to correct a clear error of law. Rule 23 specifically allows an order that grants or denies class certification. It may be altered or amended at any time before final judgment under C1C. So why isn't Judge Newman right? Your Honor, Judge Newman is mistaken on that point because Rule 23 does not dictate the standard of review that the district judge must use. It is silent on that point. Therefore, under Rule 83, district judges have the discretion to set their own standards, and most have chosen the law of the case doctrine. In fact, in the Carroll opinion from the District of New Jersey, upon which my honorable opponents have relied, Judge Kugler, in issuing his opinions, said, quote, District courts have discretion over whether to consider a successive motion for class certification and accordingly how to construe that motion, end quote. Now in his case, Judge Kugler – Which case was that of Judge Kugler? That was the Inouye Carroll opinion, which can be found at 2019 Westlaw 7184548. It is cited in Plaintiff's brief as well. It looks like there are cases all over the lot on this, certainly on a district court level. That is correct, Your Honor. And so at some point, I'm thinking about one of my colleagues who is a class action expert. I mean, it's Rule 23, and don't go engrafting other things onto Rule 23 when Rule 23 specifically takes care of something you can alter or amend at any time before final judgment. The language of 23C1C says nothing about requiring a change in the law, nothing about requiring a change in facts, a clear error, or anything like that. So what I'm saying to you is I'm reluctant to go there and face a buzzsaw of people saying, wait a minute, you're now creating a circuit split, and it's not worth it, especially when you've got language directly on point. In that event, Your Honor, I will focus on the second aspect of discretion that this case presents and that my worthy opponent did not discuss. This court's jurisprudence in Byrd makes it clear that district judges' decisions on ascertainability are reviewed for an abuse of discretion. That term is in the opinion. If you look at Byrd, there weren't any documents at all as to the household members, and we said it was still capable of being ascertained. Here the parties gave us some samples, and you look at page 163 of Byrd, it says, look, I'm the one who sort of started all this in the Marcus case, and I thought it was taken out of context in a couple of other cases like Carrera, but at least I understand the facts of Carrera. But once you got to Byrd, Judge Smith's writing, it does not mean that a plaintiff must be able to identify all class members at class certification. Instead, a plaintiff need only show that class members can emphasize, can be identified. And so if class members here can be identified from it looks to me like 05 to I guess December of 2015, is that when Sleepy's was bought out by Mattress? That sounds about right, Your Honor. I think that's what I thought. Then go to it. And if you've got 111 members who were full-time and one truck, then it seems like we're at least on the right path. Maybe other information has to be gotten from Sleepy's or its successor. But I think Judge Smith was being very careful in Byrd, trying to make it clear that don't go saying that you've got to be precise. You've got to have a mechanism in place that allows you to get to the right number. That is absolutely right, Your Honor. And in Byrd such a mechanism existed. We have to recall in Byrd the question was what the cause of action arose from, the existence of spyware that was on certain computers that were sold and leased to individuals. And in relevant part, the question in Byrd was whether a class of household members could be certified. The theory behind the action was the spyware was used to catch people in compromising positions. Right, right. And the question was, okay, well, who were the household members? Who was in that class? In Byrd, we knew the 895 people who were lessees or purchasers of the computer. We knew their addresses, and it could be ascertained from reference to a public database. Who lived with them? Or so the court thought. It remanded for the district court to explore that option. We don't know for sure from the opinion. That makes sense. Nothing, Your Honor, analogous to that exists in this case. And when I say that, we have to begin from an examination of the class definition here. Mr. Licton emphasized only one part of the definition, but it's a tripartite definition that the plaintiffs twice tried to certify. Number one, to be in a class you have to have worked full-time making deliveries for sleepings. Number two, you have to have had improper deductions taken from your wages. And number three, you have to have worked over 40 hours a week in New Jersey without being paid time and a half. Those elements were in the proposed class definition. Both times the plaintiffs tried to certify it. The only tweak the second time is that the plaintiffs limited the class to owners of single route, as they termed it. Yes, multiple times. Correct, Your Honor. The problem is that after 70 minutes of oral argument, the plaintiffs were never able to explain to the district court how those three elements could be ascertained from any set of records. In fact, the experience that the district court had was analogous to the one that this court just had a few minutes ago as it tried to pin down how we could ascertain from the types of records before us in the appendix who meets the three elements of the class definition. So the problem is not that there was an absence of absolute precision. The problem is that the records the plaintiffs presented to the district judge twice, in his judgment, after a careful review, after a careful colloquy with Mr. Lichten and looking at the documents, in his judgment, those documents did not provide a reliable and administratively feasible mechanism for discerning who worked full-time making deliveries for sleepies, who had deductions taken from wages, and who worked in New Jersey over 40 hours a week without overtime. In fact, the evidence to which Mr. Lichten just pointed this court reinforces why the district judge was at sea. Mr. Lichten, earlier in his presentation, pointed to the driver roster at Joint Appendix 1123, and I believe he termed that as easily ascertainable from that document who drove full-time for sleepies. But no such conclusion can be drawn from that document. On the contrary, when the court looks at that particular page, and it looks approximately 20% of the way down from the top, it will see the name of a driver, Brian Martin, who appears to be a driver for a single-truck carrier, 5BEM. So from Mr. Lichten's analysis, we should be able to infer, apparently, that Mr. Martin drove full-time for sleepies. The problem with that analysis is it runs smack into the record. At Joint Appendix 771, there is a declaration from that same Brian Martin in which he testifies that he almost never drove a truck, and his carrier made deliveries for customers other than sleepies, or at least another customer than sleepies. So that example proves why the district judge decided in his judgment that it could not be ascertained from this type of document, who even meets the first third of the class definition. Does sleepies have the documents in its possession that would enable one to determine if you are a full-time driver for sleepies, that there have been improper deductions and at least certain weeks you work more than 40 hours per week? Absolutely not, Your Honor, and the reason for that is built into the relationships that sleepies has with its carriers. As we explained in our discussion of the background, under the IDAs that sleepies then sign with carriers, carriers were not in an exclusive relationship. They could make other deliveries for sleepies. Excuse me. They could make deliveries for customers other than sleepies. They weren't obligated to make sleep deliveries. Let me ask you this. What would be a feasible class if you were to set one up? How would you go about it? In other words, it would seem that in a small universe of 110 people that you could get information to determine whether they're in or out. I mean, for example, Martin, Brian Martin, he appears to be an outlier. But what would, let's say it's not 111, it's 110, what would work for you when you have driver rosters, load sheets, manifest, pay statements, expense reports, security gate logs, and affidavits which are allowed? So at some point, are you saying it's absolutely impossible to ever determine who can be identified as a member of this class? Your Honor, I'm not saying that. And with all respect, it's not my burden to say that. What I am saying is on the state of this record, as opposing counsel presented it to our district judge, they didn't meet the burden of satisfying him that the class could be ascertained, and therefore the district judge never even briefed the other elements of class certification, which we fully briefed and which are before this court and, by the way, are an alternative means of affirmance. So I'm not saying that. I'm saying the plaintiffs didn't meet their burden. It was their burden below. Mr. Hank, isn't that just a quirk of the fact that you treated these folks as corporations rather than employees? Because if you had treated them as employees from the jump, you would have had to maintain by law, I think, these detailed records that would show how many hours a week they worked, how much they were paid, whether they got docked pay for damaging their lease, et cetera, right? Your Honor, my reaction to the question is at least this much. Yes, I acknowledge that the law, the New Jersey Wage and Hour Law and the Federal Fair Labor Standards Act, as a general principle requires employers to maintain pay records of their employees. So, yes, as an abstract matter, if sleepies regarded the class members or the putative class members as employees, sure, it would have kept those records. But if sleepies did not and does not so regard them, and importantly decided to name plainness, there has been no finding that members of the putative class satisfy the ABC test and are therefore sleepies' employees. So, yes, sure, I agree, Your Honor, if sleepies had thought these people were their employees, they would have kept different records. But they didn't for good reason, and they didn't keep those records. The burden remains, even in that scenario, on the Plainness Council to satisfy the district court in its discretion that this case can be maintained as a class action, and that includes meeting the ascertainability standard. Why would certification be thwarted by sleepies' incomplete record keeping? You mentioned it has an obligation under New Jersey law to keep accurate records. So if it doesn't, why shouldn't we adopt an inference in favor of the proposed class and extend the holding of Tyson Foods to the ascertainability analysis? Respectfully, I must challenge the premise of Your Honor's question. There has been no finding, there has been no evidence, and no conclusion of law that for putative class members there were any records sleepies was legally required to keep that it did not, number one. Number two, this court in Hays said, I quote, Under New Jersey law, does it have an obligation to keep accurate records? If it has an obligation to keep accurate records, Your Honor, of employees, but it has never been established that the members of this putative class are sleepies' employees, the plaintiffs want this court to employ an evidentiary burden shifting without having created the factual and legal predicate for that shifting, which are that class members are employees. That has never been proven. Reinforcing my point, Your Honor, this court said in Hays, quote, The nature or thoroughness of a defendant's record-keeping does not alter the plaintiff's burden to fill Rule 23's requirements, end quote. That is at page 356. And nothing, by the way, in Tyson Foods alters that analysis. Tyson Foods is about predominance, not ascertainability, and Tyson Foods does not stand for the proposition that plaintiffs may use representative samples to establish the employee always works in a class action. That principle is an accurate statement, I agree, Your Honor. But that principle is also implicable to our circumstances. There has been no finding here that members of the putative class are sleepies' employees. And that would seem to be the first step, right? I mean, every single person would need to – it seems like most of them are going to be employees, though, because the legal interpretation that you were taking was inconsistent with the decision that we certified to the New Jersey Supreme Court, right? The question that we certified. The result of that was adverse to your legal theory about whether these folks were independent contractors or employees, right? Your Honor, I must vigorously disagree with that assertion. The employee status will be governed by the ABC test. Prong A of that test is the control test. It's the common law right to control test, analogous to Darden. Now, it's true that the district judge found as a matter of law that the three main plaintiffs were all employees under that test. It's also true that prior to that ruling in this case, he found as a matter of law that they were not all employees under the control test. And granted somebody judging to us, I would infer from that experience that there is at least a debate on Prong A. Prong B requires the individual to have worked off of Sleepy's premises or to have not been involved in matters integral to its business. That is not concluding for the class, and it's not obvious at all that it can be. Take, for example, Brian Martin, whose name is on the roster, upon which Mr. Lichten places so much reliance. That individual said he almost never drove for Sleepy's. We can't know that he was on its premises very often. It is hardly obvious to me that he can satisfy Prong B. And Prong C requires that the individual be in a business that could have continued outside of its relationship with Sleepy's. It's not obvious at all that class members can meet those elements. Additionally, Your Honor, and we brief this below, it's additional ground for affirmance, it is not obvious how those three elements could be ascertained in the class action because the imbalances is individualized. Go back to my example of Mr. Martin. I can't imagine how he would meet Prong A. Now, the main plaintiff did meet Prong A in Judge Sheridan's judgment, but that just goes to show you how individualized the analysis is. So the court, in addition to affirming on the grounds upon which the district court ruled, could also affirm on the other grounds that we briefed, but it didn't reach, including predominance. The plaintiffs have not explained how on this record the elements of liability could be proved in common evidence. I don't think predominance is before us. I think it's all about ascertainability. Your Honor, I respectfully disagree. The court may rule on whatever ground it wishes to focus on. However, the court may affirm a district court's opinion on any basis that was fully briefed below. When we briefed that class certification below, we argued against certification not only on ascertainability grounds but also on predominance grounds and other grounds. So we preserved those issues. And what did Judge Sheridan rule on predominance? He did not reach those issues because he didn't reach ascertainability, but this court may if it so chooses. It's optional. It's at your discretion, Your Honor, but you may. I think I'd probably want to let him have the first shot at that. But anyway, is there anything else you want to – any further questions of my colleagues? I have none. Okay. If you could just briefly, Mr. Hank, respond to the same line of question I asked Mr. Lipton, because it seems sort of, from a pragmatic standpoint, wasteful for you and Mr. Lipton to litigate 70 or 111 separate cases if you can get it all done in one bundle. But the appropriateness of doing it in one bundle is, of course, dependent upon there being ascertainability and consistency here from the documents. And I'm interested in your response to the question I asked him of what can we see in these documents or anywhere on the record about individuals driving more than 40 hours a week or having deductions from their pay. And maybe you could start with the deductions issue, because I did see in the record several places where guys were docked $25 here or there. The inference I drew from those deductions was that there was either a late delivery or a customer complaint or maybe in one case or a few cases a little damage to the product. Your Honor, respectfully, you did not see that in the record. What Your Honor saw in the record were outside carrier expense details, which reflected that sleepies made deductions not from any individual driver, but from the carriers within the business because of some deficiency in their performance, for example, garbage on the truck. And the record further shows this is supported both by the testimony of the plaintiff's paralegal who testified in support of class certification and by members of the putative class, including Henderson Clark, is that you can't tell from the outside carrier expense details what the carrier did in response to that deduction. You can't tell whether the carrier turned around and imposed a wage reduction on any individual in response to that deduction. The carrier may not have done any such thing. In fact, that's not speculative. Henderson Clark testified, and we quoted this in Glock in our brief, that when sleepies made deductions from him, he didn't pass those deductions on in the form of a wage reduction to anybody else. That being the case, then neither Henderson Clark nor anybody else who worked for his company could prevail under the wage payment law because those people didn't experience the cause of that. But I thought the whole point of them shrinking the class to 111 was that there wouldn't be any person whom Henderson Clark could dock, that the 111 were, quote, companies that were actually one individual with one truck working full-time for sleepies. Isn't that their theory? That's their theory, Your Honor, but it doesn't square with the facts. Individuals who own carriers, even if they only own one truck, can hire drivers and helpers, and in fact they do it. That's why Brian Martin, to go back to my example, almost never drives. He doesn't have to. So the fact that an individual signed a contract on behalf of his carrier with sleepies and the fact that that individual carrier only had one truck, it cannot be inferred from those facts that that individual reacted to any deductions that sleepies made to the carrier by making a wage deduction to anybody who worked for them, including himself. How many of the 111 outsourced work as opposed to did all the work themselves? The record doesn't tell us the answer to that question, Your Honor. I can give you anecdotal examples, but I don't know that, and I don't know if anybody else does. When you go through a security gate, don't you give the driver name, the contractor ID? And so, you know, if it's Jim Smith, it's going to be Jim Smith, right? I mean, you're saying, no, it was Jim Smith's helper. No, I'm not saying that, Your Honor. If the gate log reflects that it was Jim Smith, presumably it was Jim Smith, but what the gate log does not tell you is whether later that day Jim Smith's carrier with Jim Smith at the wheel made a delivery for another customer. It doesn't tell you whether the next day Jim Smith made a delivery for another customer. It doesn't tell you whether Jim Smith personally worked full-time for sleepies. He may not have. It doesn't tell you whether Jim Smith's carrier experienced any deductions from sleepies. It doesn't tell you whether that carrier passed on those deductions to any of its drivers, and it doesn't tell you whether Jim Smith worked over 40 hours a week without his carrier paying him overtime, Your Honor. And that's why Jeff Sheridan was in the position he was in. But then you have the proposed class introducing affidavits, which are allowed under our city-select case. So if the sleepies records don't necessarily have enough to tell you the information that you're just talking about, the affidavit of Jim Smith, this hypothetical person, wouldn't that close the gap? Your Honor, that would be precisely what this court forbade in Marcus Hayes and Carrera. No, I don't think so. I mean, having written Marcus, that wasn't my intent. My intent was in Marcus, you know, case of bad facts. I mean, you had a non-defendant who had the information relating to these run-flat tires. I mean, there was nothing there that could allow the dealer or almost anybody to find out the real information. And so what we said was, very simply, in ascertainability, you need a mechanism in place. It's helpful to have a mechanism in place that works. It's, one, that it's defined with reference to objective criteria. And then I added, two, it's a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition. And it's been taken out of context, I thought, in some other cases, but I thought Byrd rectified it. If you can identify, then you're fine. You meet ascertainability. And, I mean, if we keep down the path that you're doing here, you're going to get, like, in our court, you've got two judges, Judge Fuentes and Brendel, saying, you know, the ascertainability requirement of the Third Circuit has been criticized by a number of other circuits. It's being done very rigidly. Let's get rid of the darn thing. I mean, we're engrafting something here that's causing all kinds of problems. And so I thought Judge Smith, Chief Judge Smith, in Byrd, set the record straight. Your Honor, all we're asking for is the court to apply its precedent as per Byrd and City Select. In both of those cases, this court said affidavits could be part of the solution, but they have to be part of the solution where there's objective, ascertainable records that they are augmenting. In Byrd, those records were the publicly available databases showing what 895 households were. In City Select, it was a credit-smart database that wasn't produced in discovery, but the court believes, clearly, based on the briefing, that that database alone might tell you everybody who'd been the victim of the offending conduct, in that case, getting junk faxes. Now, in both of those opinions, the court said, if you need affidavits to fill in the gaps, and you have that objective evidence, you may be able to do that. In fact, in neither of those cases, in this court's opinion, were affidavits part of the solution. And here, unlike in Byrd and unlike in City Select, there are no records that affidavits would augment. To answer the question the court asked earlier. I just repeat what I said to your opposing counsel. I thought in Byrd there weren't any documents at all as to the household members. Is that correct? I'm not sure that's a fair characterization, Your Honor. In Byrd, the plaintiffs pointed to this methodology of identifying the household members. Identify the addresses of the 895 purchasers and lessees. You now know the households. You can tell from publicly available databases who lives there. So that is objective. That is feasible. And this court remanded to the district court to explore that possibility. Now, on top of that, affidavits perhaps might have been useful in Byrd, for example, for the householder to say not only did I live there, but I used the computer. This case is different from Byrd. None of our records tells you the first thing there is to know about whether the person worked exclusively for sleepies, about whether the person's carrier passed on deductions in the form of wage reductions, or about whether the carrier neglected to pay overtime in 40 hours in New Jersey. There isn't a record that we have that tells you the first thing about any one of those questions. If this court remands for affidavits, affidavits will be all that there is, and that will contribute to the teaching not only of the Marcus Hayes Carrera Trilogy, but also of Byrd and also of City Select, Your Honor. All right. Judge Harden, but I interrupted you. Do you have any further follow-up? No, no, no. Thank you, Judge Emmer. Judge Estrepo? I'm good, thanks. All right. Thank you very much, and we'll hear from Mr. Lincoln, please. Thank you. Thank you. With all due respect to Mr. Hank, I think he stretches the truth beyond anything that's realistic. First, with respect to Mr. Martin, this is a straw dog. Mr. Martin is on the driver roster, but as I said, and I thought I made this very clear, you take the driver roster as the starting point for who the authorized driver is. You then look at the logs, the gate logs, and you can look at the expense reports, and you can then look at the Agitech schedules, and you can determine if he is truck, if he drove his truck or if he drove. He's not in the class. He's never been in the class because, while it may be that he was an authorized driver, he did not drive. And I've never said that that driver roster is to determine the class. It's the starting point for making the analysis, and he's not part of the class because the class is defined by who were full-time drivers. Now, we did, for two of the plaintiffs, just to show that it could be done, we had a paralegal, a data analyst, go through all of the documents, all of these five sets of documents that she was able to determine, and it's in the record, and we've submitted the package for it that Henderson Clark and Mr. Hargrove, two of the plaintiffs, and she looked at a period of about 75 days, drove the truck for almost all of those days, had deductions taken. We know what their estimated times were because, for Mr. Clark, for example, we have his manifest that have each of the deliveries he did that day and the company's estimated time for each of those. And we have the Agitech data that shows how many stops he was scheduled to do that day and what this estimated time was. So to say that there are no records from which this can be determined is just not true. Secondly, as one of the justices said, I'm sorry I haven't memorized your voices, in the Lamatil case, you specifically said, with respect to this question of the obligation to keep documents, and this was on a predominance question but it's the same analysis, that Mount Clemens and Tyson Foods would apply to employment situations where employers are required to keep records. It didn't apply to Lamatil because that was an antitrust action. But you specifically said, Judge Ambrose, that Tyson Foods and Mount Clemens would apply in an employment situation. And here, the judge has already found that the three plaintiffs were employees. And when you look at the three prongs, particularly prong B, which only looks at whether they were engaged in the company's usual course of business, which of course mattress delivery is part of the usual course of sleepy's business, and whether they performed that work outside of all places of business, which they clearly did not because the judge, Sheraton, already found that both the routes and the garages where they had to go each day, the terminals, were part of the places of business, that they were based on that employee. The ABC test means the employer has to satisfy all three parts or he loses. So they lose a prong B. Prong B is the same for these three plaintiffs as it would be for every driver. All the drivers reported to the same terminal and did the same thing. And with respect to prong C, the evidence in the record that we've cited is that you have to have been able to do this work for someone else. It's whether you could survive the termination of sleepy's. And the record shows that none of these contractors were allowed by reason of their contract to have any other product on their truck while they were driving for sleepy's. And if you look again at the Agitech records and the schedules, they were making 14 and 15 stops a day, five or six days a week. And there are DOT driving regulations that prohibit too much driving at a time. So there's no question that under prong C they would be found to be employees because they could not have driven for other companies. There just wasn't time to do that. And that's what Judge Sheridan also found. And he also found that there were – Can I just ask you the same question as Mr. Hank? Isn't it true that if they had, in your view, they should have been classified from the get-go as employees, correct? Absolutely. And if they had been properly classified, then they would have really detailed – you wouldn't have to do this sort of difficult effort to piece together things and ask that inferences be drawn. They would, by law, be required to keep detailed records that would show exactly what the answers to these questions are about overtime and deductions, correct? Yes. There's a New Jersey statute. We cite it in our brief. I don't have it in front of me. It says that they have to keep records of hours and time worked. End of story. And by this period of time, 2010, with all the FedEx litigation that was going on at the time, sleepies either knew or should have known that this was going to be an issue. And what I said about Lamatil is, under Mount Clemens and Tyson Foods, where the employer should have kept records but did not keep records, the court is allowed to make inferences based upon representative data that would not otherwise be the case if this were a consumer case like Lamatil. That's what I'm getting at, though, because you say they should have known. I mean, they took a position, obviously self-interested, that these folks were independent contractors. And that was a position taken in good faith, and that was a position that even got the approval of a federal judge until we took the case and certified the question in the New Jersey Supreme Court held otherwise. So isn't this just sort of, from your client's perspective, to the extent you want a class certified, sort of the unfortunate occurrence that the regime that governed at the time these events occurred, they had a good faith argument that these folks were independent contractors. They didn't keep the records that would be necessary for the class to be ascertained. Why isn't that the position in which we find ourselves? Right, and that's a good question. Because under Mount Clemens and Tyson Foods, it's not a matter of fault or good faith. If, in fact, it turns out they were employees, and if, in fact, they should have kept records but didn't, no one is saying they should be penalized for that. What the courts say is that the failure to do that, though, should not be placed on the employees. They should not be the one punished for that. The employer just has to now allow representative evidence to be presented to prove class certification and predominance and things like that that might not otherwise be the case. If they had kept records, it's not casting aspersion on anyone. It's just a question of burdens. I think it's fair if the burden has to be placed for it to be placed on the employer, even though I vehemently think that there is sufficient records here, easily, from which the class can be identified how much time they worked. With respect to that also, I would point out that Mr. Hanks said that we had to prove two things for class certification. One is that they worked over 40 hours and that they suffered deductions. I don't think it's important. If we didn't make this clear, we certainly meant to. There would be two separate classes, really, when you think about it. There would be people who worked over 40 hours, although they're certainly going to have suffered deductions also, and there are going to be people who suffered deductions, may not have worked over 40 hours. I don't think you'd have to meet both because each is a separate violation. One is a violation of the New Jersey Wage and Hour Law, and the other is of the Wage Payment Law. I think that's all I had to say. Thank you very much. No, thank you. Thank you to both. First of all, colleagues, any further questions? Not any further. I want to thank both counsels for very well-presented arguments, and I would ask that a transcript be prepared of this oral argument and split the cost between you, if you would. It's a real privilege having both of you here today with us today, at least virtually.